UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ARYZE, LLC and DAVID ASKEY, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 21-cv-10789-ADB |
| | * | |
| DAVID SWEIG and CARCHARADON, LLC, | * | |
| | * | |
| Defendants. | * | |
| | * | |

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTION TO COMPEL ARBITRATION

BURROUGHS, D.J.

Plaintiffs Aryze, LLC ("Aryze") and David Askey ("Askey," and, together with Aryze, "Plaintiffs") bring this action against Defendants David Sweig ("Sweig") and Carcharadon, LLC ("Carcharadon," and, together with Sweig, "Defendants"), seeking a declaratory judgment that they are not bound to participate in a JAMS arbitration (the "Arbitration") that Defendants have initiated against them. [ECF No. 1-1 at 4–17]. Currently before the Court is Defendants' motion to compel arbitration. [ECF No. 21]. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

I.      BACKGROUND

A.      The Parties

Aryze—a Delaware limited liability company with its principal place of business in Massachusetts—is an entity intended to license robotics technology from Ascend Robotics LLC ("Ascend"), a distinct but affiliated company, for use in the commercial painting industry. [ECF No. 1-1 at 7–8]. Askey, a Massachusetts resident, is Aryze's manager. [Id. at 8]. Carcharadon

is an Illinois limited liability company, and Sweig, an Illinois resident, is its managing member. [Id. at 6–7].

### B.        Prior Litigation, Arbitration, and Underlying Factual Allegations

In March 2020, Defendants initiated the Arbitration against Plaintiffs and Ascend.  [ECF No. 1-1 at 6].  In May 2020, Ascend filed suit in Massachusetts state court seeking a declaratory judgment that it was not required to participate in the Arbitration.  [Id.].  Defendants removed the case to federal court and moved to compel arbitration.  [Id.].  The Court denied Defendants' motion on February 5, 2021, Ascend Robotics LLC v. Carcharadon, LLC, No. 20-cv-10934, 2021 WL 413639 (D. Mass. Feb. 5, 2021), and entered judgment in Ascend's favor on April 6, 2021, Final Judgment, Ascend Robotics LLC v. Carcharadon, LLC, No. 20-cv-10934 (D. Mass. Apr. 6, 2021), ECF No. 31.  After the Court denied their motion but before it entered judgment, Defendants filed an Amended Statement of Claims ("ASOC") in the Arbitration.  [ECF No. 1-1 at 7]; see [ECF No. 20-4].

In their ASOC, Defendants bring the following seven claims: (1) breach of contract (asserted against Plaintiffs by Carcharadon) (Count I), [ECF No. 20-4 ¶¶ 289–97]; (2) breach of contract (asserted against Plaintiffs by Sweig) (Count II), [id. ¶¶ 298–309]; (3) fraud (asserted against Askey by Defendants) (Count III), [id. ¶¶ 310–18]; (4) promissory fraud (asserted against Askey by Defendants) (Count IV), [id. ¶¶ 319–25]; (5) negligent misrepresentation (asserted against Askey by Defendants) (Count V), [id. ¶¶ 326–33]; (6) equitable estoppel (asserted against Plaintiffs by Defendants) (Count VI), [id. ¶¶ 334–40]; and (7) breach of fiduciary duty (asserted against Askey by Defendants) (Count VII), [id. ¶¶ 341–44].  Defendants contend that their claims against Plaintiffs are arbitrable "in accordance with the arbitration provisions of the pertinent agreements between the parties."  [Id. at 3].

The factual allegations in Defendants' ASOC are nearly identical to those in their initial statement of claims.  See [ECF No. 23-1 at 1–80 (redline demonstrating that factual allegations are largely unchanged)].  For that reason, the Court adopts and recites the facts as set forth in its previous Order:

> Sweig has nearly three decades of experience as a management consultant, investment banker, and entrepreneur.  He has advised companies of various sizes and stages of development regarding mergers and acquisitions, restructuring, and capital management.  In August 2017, Sweig was introduced to Askey and Robert Cohanim [("Cohanim")].[1]  Askey and Cohanim told Sweig that they were working on a "major global business opportunity" involving the use of robots as substitutes for human laborers in the commercial painting industry, but needed assistance in "defining, organizing, and pursuing" the business opportunity.  Ascend, a company owned by Askey, would supply the underlying robot technology.  Askey and Cohanim, who noted their experience with and knowledge of technology start-ups and the construction industry, invited Sweig to join their business venture, emphasizing that Sweig's skillset was integral to the venture's success.  They also told him that they had promising leads in the search for potential investors and that the painting robot prototype would be ready for testing by August 2018.
>
> Sweig was interested in joining the business venture and sent Askey and Cohanim a draft contractor and consulting agreement for their review.  Sweig, Askey, and Cohanim, each represented by counsel, negotiated the terms and, in December 2017, executed an agreement (the "December 2017 Agreement").  Pursuant to the December 2017 Agreement, Askey, Cohanim, and Aryze's predecessor, Phoenix Construction ("Phoenix"), retained Carcharadon to provide Phoenix with "analysis, advice and assistance with respect to a wide variety of strategic, financial and operational issues related to the commercialization of various robotics applications for the global construction and/or adjacent marketplaces."  Carcharadon, among other things, was to consult on "[s]trategic issues including business definition, route to market, pricing, strategic partnerships"; "[o]perational issues including defining capability and competency requirements, hiring/resourcing, contract manufacturing and supply chain"; "[f]inancial issues including development of an operating budget, financing plan and capital structure as well as pricing structure"; and "[a]dministrative issues including working on the LLC agreement, branding, policies/procedures and business processes as well as various legal matters."  As compensation, Carcharadon would receive $55,000 in installments, a 5% ownership interest in Phoenix, which would incrementally vest at periodic intervals, and a board seat.  The December 2017 Agreement's integration clause provides that the agreement "contains the entire agreement of the parties and supersedes all prior agreements and understandings between the parties regarding

---

[1] Robert Cohanim is not a party to either this litigation or the Arbitration.

Carcharadon's engagement," and its arbitration clause states that "[a]ny disputes between the parties arising from this Agreement will be settled through binding arbitration through JAMS in Chicago, Illinois or similar body."[2]  Ascend is not a party to the December 2017 Agreement.[3]

In January 2018, Aryze was formed, and the parties agreed that it would step into Phoenix's shoes with respect to the December 2017 Agreement.  Sweig and Askey discussed how best to grow Aryze, agreeing that Aryze should be a distinct corporate entity and that Ascend should provide its existing [intellectual property ("IP")] and technology to be utilized freely by Aryze.  More specifically, the parties contemplated an arrangement whereby, in exchange for equity in Aryze, Ascend would grant Aryze an exclusive, perpetual, royalty-free license to use all current and future Ascend IP in the commercial painting industry and related markets.

In early 2018, Sweig, through Carcharadon, began assembling a team of construction experts and other advisors for Aryze.  By May 2018, Sweig had nearly completed a confidential investor memorandum ("CIM"), a teaser,[4] and a detailed five-year financial forecasting and economic return model.  Askey and Cohanim reviewed and approved the materials that Sweig had prepared, which, among other things, outlined the IP licensing plan.  Sweig told Askey and Cohanim that Aryze needed capital to support its operations and highlighted the importance of developing a working robotic prototype and partnering with construction companies.  To allow him to focus on Aryze and help it raise the necessary capital by October 2018, Sweig terminated two lucrative Carcharadon consulting agreements, which, in combination, were generating monthly revenue between $65,000 and $75,000.  He also forwent additional, potentially profitable business opportunities to focus his energies exclusively on Aryze.

In June 2018, Carcharadon entered into another agreement with Aryze, Askey, and Cohanim (the "June 2018 Agreement," and, together with the December 2017 Agreement, the "Agreements").  Under the June 2018 Agreement—to which Ascend is again not a party[5]—Carcharadon was engaged to provide Aryze with "consulting services, analysis, advice, and assistance with respect to ARZYE's [sic]

---

[2] The December 2017 Agreement was subsequently amended in December 2018 to reflect the fact that Carcharadon's ownership interest had vested.

[3] Apart from the fact that the December 2017 Agreement is addressed to "Mr. David Askey[,] Chief Executive Officer[,] Ascend Robotics LLC," the December 2017 Agreement does not reference Ascend.

[4] A teaser is a one-page summary of the CIM.

[5] Apart from the fact that the June 2018 Agreement is addressed to "Mr. David Askey[,] Chief Executive Officer[,] Ascend Robotics LLC," the June 2018 Agreement does not reference Ascend.

efforts to raise up to $50 million capital, in one or more Series ('Committed Capital') in support of Aryze's commercialization." The June 2018 Agreement would last until (1) Aryze raised $50 million in Committed Capital, (2) Sweig joined Aryze as CEO or CFO, or (3) June 2019, whichever occurred earliest. As compensation, Carcharadon would receive a monthly $10,000 retainer, a cash bonus of $375,000 once Aryze obtained [] $7.5 million in Committed Capital, and additional cash bonuses contingent on how much Committed Capital Aryze ultimately obtained. The June 2018 Agreement contains integration and arbitration provisions identical to those in the December 2017 Agreement.[6]

After the June 2018 Agreement was executed, Sweig continued to emphasize to Askey the importance of the IP licensing agreement between Ascend and Aryze. In July 2018, Askey or his attorneys sent Sweig a draft IP licensing agreement that was consistent with Sweig's understanding of the plan. At the same time, Sweig continued to work on the CIM, teaser, financial forecasts, and other business-related documents. Askey consistently provided positive feedback about Sweig's work and never commented on or contradicted statements about the IP licensing agreement included in those documents. By August 2018, Sweig had completed a seventy-four page CIM for Aryze, but neither Askey nor Cohanim had brought in any potential investors and they were behind schedule on producing the robotic prototype. Nonetheless, potential investors were intrigued by the materials that Sweig had prepared and continued to express interest in investing in Aryze, focusing, in particular, on the relationship between Ascend and Aryze.

By February 2019, Sweig's frustration with Askey was mounting, given Askey's consistent delays and failure to provide Sweig with necessary information. For instance, although Aryze was formed in early 2018, there still was no finalized operating agreement ("OA").[7] Sweig outlined his frustrations in an email to Askey, noting that if various open items, such as the lack of a finalized OA and IP licensing agreement, remained unresolved by March 2019, he would sever ties with Aryze. Askey acknowledged Sweig's concerns but did not finalize the documents.[8] Sweig threatened to quit, but ultimately agreed to remain with Aryze only after the June 2018 Agreement was amended to provide for additional cash payments to

---

[6] The June 2018 Agreement was subsequently amended in December 2018 to extend the term and alter the compensation structure and again in March 2019 to further adjust the compensation structure by providing for immediate cash payments.

[7] An OA is "a key document used by LLCs because it outlines the business'[s] financial and functional decisions including rules, regulations and provisions. The purpose of the document is to govern the internal operations of the business in a way that suits the specific needs of the business owners. Once the document is signed by the members of the limited liability company, it acts as an official contract binding them to its terms."

[8] Around this time, Askey informed Sweig that Cohanim would no longer be involved with Aryze in any meaningful way.

Carcharadon.  Shortly after the amendment, Ascend paid Carcharadon $85,000 on behalf of Aryze.[9]

In April 2019, Sweig initiated serious discussions with Saint-Gobain, a world-renowned building products and materials company, regarding an investment in Aryze.  Sweig met with Saint-Gobain representatives on April 25, 2019, and by May 2019, Saint-Gobain expressed interest in investing in Aryze.  Given Saint-Gobain's reputation in the construction industry, its investment in Aryze would have signaled to other investors that Aryze was a promising company.  During the same period, Sweig was also in contact with WeWork Companies, Inc. ("WeWork"), one of the world's largest landlords, regarding WeWork possibly becoming an Aryze customer.  Sweig reported the positive results of a field test completed by the Aryze robot, and WeWork indicated interest in collaborating with Aryze.

The developments with Saint-Gobain and WeWork intensified the need for Aryze to finalize its OA and IP licensing agreement with Ascend.  In late May and again in June 2019, Askey sent Sweig a draft IP licensing agreement that was consistent with Sweig's expectations.  By that time, Askey and Ascend had produced a working robotic prototype, and Sweig had updated Aryze's CIM and teaser accordingly.  The updated materials stated that Aryze had a perpetual, royalty-free IP license from Ascend.  Askey and Sweig met with Saint-Gobain representatives in June 2019 and, at the meeting, told them that Aryze had negotiated a perpetual, royalty-free license agreement with Ascend.  Around the same time, Askey sent Sweig another draft Aryze OA, which reflected an increased ownership interest for Sweig as well as his capital contribution.  Still, Askey did not finalize the OA, blaming lawyers and other time commitments.  Sweig offered to assume responsibility for finalizing the OA, but Askey refused to cede control of the drafting process.

In July 2019, Sweig continued to have productive discussions with Saint-Gobain, who remained interested in investing.  In light of Saint-Gobain's interest, Sweig began vetting law firms to represent Aryze in a potential investment transaction, including, at Askey's suggestion, Holland & Knight, LLP ("H&K"), which represented Askey and Ascend.  During his search, Sweig emphasized to Askey that Aryze and potential investors needed independent counsel to ensure that all of Aryze's foundational documents, including the OA and the IP license agreement, were suitable, financeable, and market-based.  When Sweig told Saint-Gobain that Aryze was considering retaining H&K, Saint-Gobain told Sweig that H&K was Saint-Gobain's counsel, expressed concerns about potential conflicts of interest, and told Sweig that its strong preference would be for Aryze to retain another law firm.  Sweig relayed Saint-Gobain's message to Askey, and continued his law firm

---

[9] Ascend subsequently paid Carcharadon an additional $125,000 on Aryze's behalf, pursuant to the June 2018 Agreement as amended.

search.  During the search, Sweig learned that Askey and H&K had been discussing revisions to the IP licensing agreement and the OA.

In August 2019, Sweig and Askey exchanged emails and phone calls regarding Sweig's ownership interest in Aryze.  After some back and forth, Sweig and Askey seemed to agree that Askey would own 22.8% of Aryze, Ascend would own 21.2%, and Sweig would own 17.5%, and that Askey, Ascend, and Sweig would be the only three voting members.  Later that month, Askey sent Sweig the latest draft of the IP licensing agreement.  Unlike the previous versions, which had all outlined the same basic arrangement, this draft was materially different in that it did not grant Aryze a perpetual, royalty-free license for Ascend's IP.  Sweig consulted counsel at DLA Piper who informed him that Saint-Gobain would be unlikely to invest if Aryze were to execute that version of the IP licensing agreement, and he communicated this concern to Askey.  Over the next few weeks, Sweig sent messages and emails to Askey and H&K attorneys, expressing his surprise and disappointment in what he perceived to be a "bait and switch" regarding the structure of the IP licensing agreement.  Askey told Sweig that H&K was revising the agreement to address Sweig's concerns, and, during a conference call with Aryze's advisory board, blamed the issues on H&K.  H&K circulated a new draft of the IP licensing agreement on September 15, 2019 but it did not address any of Sweig's concerns and, in fact, was even more problematic than the prior draft. Sweig texted Askey noting his frustration and disappointment and suggested that they discuss the situation over the phone.

On September 17, 2019, Sweig, Askey, and lawyers from H&K and DLA Piper had a conference call.  During the call Askey held firm on the new licensing language and said that he was going to present the draft IP licensing agreement to Saint-Gobain notwithstanding Sweig's concerns.  During another conference call the same day, Askey stated Ascend's desire to leverage Aryze's operating platform to support other Ascend businesses.  The same day, Askey fired Sweig during yet another conference call.  Two days later, he sent an email to Sweig confirming that he had terminated the Agreements.  Askey stated two reasons for the termination: (1) Sweig's indication that if asked by Saint-Gobain, he would communicate his disapproval of the draft IP licensing agreement; and (2) the fact that Sweig's temperament made him ill-suited to serve as an Aryze executive.  About five months later, in February 2020, Askey told Sweig that Aryze ceased operations shortly after Sweig was let go.

In sum, Sweig alleges that he, through Carcharadon, provided services to Aryze for nearly two years based on his understanding that he would end up with equity in a valuable company.  Then, after he had done a great deal of legwork—including, but not limited to, preparing financial forecasts and documents, engaging advisors, and lining up potential investors and customers—Askey, Aryze, and Ascend abruptly changed course and decided that Aryze would not be fully independent from Ascend even though, in Sweig's view and the views of others knowledgeable in the field, such independence was integral to Aryze's value.  In Sweig's words, Askey, Aryze, and Ascend "deceitfully induce[d] [] Sweig, whose expertise,

network of stellar relationships, and energy they needed, to build a major business—and then at the 11th hour, after [] Sweig's efforts had substantially assured success, [they] turn[ed] a blind eye to their inducements—and seize[d] the immense opportunity for [] Askey and his company, Ascend Robotics, LLC."

Ascend Robotics, 2021 WL 413639, at *1–4 (some alterations in original) (footnotes in original) (citations omitted).

### C.   Procedural Background

On April 23, 2021, Plaintiffs sued Defendants in Suffolk County Superior Court, seeking a declaratory judgment that they are not required to participate in the Arbitration.  [ECF No. 1-1 at 4–17].  Defendants removed the action on May 13, 2021, [ECF No. 1], and, after the case was reassigned to this Court, see [ECF Nos. 6, 7], answered on June 9, 2021, [ECF No. 8].  On July 23, 2021, Defendants moved to compel arbitration.  [ECF No. 21].  Plaintiffs opposed on August 13, 2021, [ECF No. 23], Defendants replied on August 27, 2021, [ECF No. 24], and Plaintiffs filed a sur-reply on September 10, 2021, [ECF No. 26].

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") was enacted primarily "to overcome judicial hostility to arbitration agreements," Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 272 (1995), and it "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts,"  Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011) (quoting Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006)).  Under the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The party seeking to compel arbitration bears the burden of proving "that a valid agreement to arbitrate exists, the movant has a right to enforce it,

the other party is bound by it, and that the claim asserted falls within the scope of the arbitration agreement." Oyola v. Midland Funding, LLC, 295 F. Supp. 3d 14, 16–17 (D. Mass. 2018) (citing Bekele v. Lyft, Inc., 199 F. Supp. 3d 284, 293 (D. Mass. 2016), aff'd, 918 F.3d 181 (1st Cir. 2019)).

"[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute." Granite Rock Co. v. International Brotherhood of Teamsters, 561 U.S. 287, 297 (2010) (emphasis omitted). The First Circuit has stated that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." InterGen N.V. v. Grina, 344 F.3d 134, 142–43 (1st Cir. 2003) (quoting AT&T Techs., Inc. v. Commc'ns. Workers of Am., 475 U.S. 643, 648 (1986)). Although there are some exceptions, "courts should be extremely cautious about forcing arbitration in 'situations in which the identity of the parties who have agreed to arbitrate is unclear.'" Id. at 143 (quoting McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994)). "[A] 'basic precept' underlying the FAA is that 'arbitration is a matter of consent, not coercion.'" Ouadani v. TF Final Mile LLC, 876 F.3d 31, 36 (1st Cir. 2017) (quoting Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 681 (2010)).

## III.    DISCUSSION

Courts decide whether a particular claim is arbitrable unless the parties have agreed to delegate that question to the arbitrator. See Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 623 (1st Cir. 2019) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)). Here, neither party has argued that the arbitrability question has been delegated. Accordingly, the Court decides arbitrability.

The [FAA] has been interpreted to require that if a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this

> will lead to piecemeal litigation.  From this it follows that state and federal courts must examine with care the complaints seeking to invoke their jurisdiction in order to separate arbitrable from nonarbitrable claims.

KPMG LLP v. Cocchi, 565 U.S. 18, 19 (2011) (per curiam) (citing Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 217 (1985)).  In the ASOC, Defendants assert seven claims against Plaintiffs.  [ECF No. 20-4 ¶¶ 289–344].  The Court addresses each claim in turn to determine whether it is arbitrable.  As noted above, under the Agreements' identical arbitration clauses, a claim is arbitrable if it is a "dispute[] between the parties arising from [either] Agreement." [ECF No. 20-5 at 18 (December 2017 Agreement); id. at 43 (June 2018 Agreement)].

### A.      Count I: Breach of Contract (Against Plaintiffs by Carcharadon)

Carcharadon premises its breach of contract claim on multiple alleged breaches by Plaintiffs including, but not limited to, (1) terminating the Agreements in bad faith, (2) failing to timely provide necessary information to Sweig, (3) frustrating the purpose of the Agreements by changing course regarding the structure of the IP license agreement and altering the "vision" for Aryze, and (4) seizing the business opportunities that Carcharadon created for Aryze for Ascend. [ECF No. 20-4 ¶ 295].

To the extent Carcharadon's breach of contract claim rests on Plaintiffs' alleged bad faith termination of the Agreements, that claim is clearly a "dispute between the parties arising from" the Agreements.  How and under what circumstances one party may terminate a contract is a quintessential dispute arising from the contract, and resolving Carcharadon's claim will undoubtedly involve construction of the Agreements' provisions.  In opposing Defendants' motion, Plaintiffs argue that Defendants' termination-based breach of contract claim does not arise from the Agreements given that (1) Askey severed ties with Carcharadon because of his disagreement with Sweig over the draft IP license agreement and (2) Carcharadon is seeking $40 million instead of the "accrued and unpaid fees and expenses" described in the Agreements.

[ECF No. 23 at 15].  These arguments miss the mark.  Whatever his reason, it is undisputed that Askey terminated the Agreements, and whether his actions amounted to a breach is unquestionably a dispute arising from the Agreements.  As to damages, the remedy that Defendants seek, on the one hand, and the nature of their claim, on the other, are two distinct issues.

To the extent Carcharadon's claim rests on Plaintiffs' failure to timely provide necessary information, that claim is also covered by the Agreements' arbitration clauses.  The December 2017 Agreement requires Plaintiffs to provide "timely and accurate" information.  [ECF No. 20-5 at 17].  Accordingly, Carcharadon's claim that Plaintiffs failed to do so is a dispute arising from that agreement and is therefore arbitrable.

Insofar as Carcharadon's breach of contract claim is premised on any other alleged misconduct referenced in the ASOC, however, it is not arbitrable because it is not a "dispute[] . . . arising from" the Agreements.  [ECF No. 20-5 at 18, 43].  First, as noted in the Court's previous Order, the Agreements neither mention Ascend's IP nor govern whether and how Aryze would acquire the use of it.  Ascend, 2021 WL 413639, at *6.  Accordingly, claims related to Ascend's IP or whether and how Aryze was to acquire the use of it, including Carcharadon's claim that Plaintiffs frustrated the purpose of the Agreements by changing course on the IP license agreement, do not arise from the Agreements.  Second, Carcharadon's claim that Plaintiffs frustrated the purpose of the Agreements by altering the "vision" for Aryze does not arise from the Agreements because the Agreements do not set out a specific "vision" for Aryze.  Rather, pursuant to the Agreements, Carcharadon was hired to consult, advise, assist, and provide analysis, see [ECF No. 20-5 at 40]; see also [id. at 15], and the Agreements impose no obligation on Plaintiffs to utilize this consultation, advice, assistance, and analysis with a specific

vision in mind.  Third, Carcharadon's claim that Plaintiffs seized control of the business opportunity that it created also does not arise from the Agreements.  The Agreements do not speak to what Aryze was permitted to do once Carcharadon provided the contracted-for services. Therefore, whether Plaintiffs wrongfully elected to use Carcharadon's work to benefit Ascend is not a dispute arising from the Agreements.  Tellingly, with respect to each of these alleged breaches, Defendants have not identified a specific contractual provision which Plaintiffs have allegedly breached.  In essence, Defendants seek to read contractual obligations (e.g., sticking with the initial IP license agreement, maintaining a consistent vision for Aryze) into the Agreements and hold Plaintiffs liable for breaching them.  But if Plaintiffs made any promises to Defendants regarding those issues, they were extra-contractual (or embodied in contracts other than the Agreements).  The parties easily could have baked obligations regarding Ascend's IP and Aryze's structure into the Agreements but elected not to do so.  One consequence of those decisions is that disputes involving breaches of those purported promises do not arise from the Agreements and are therefore not arbitrable.

In sum, to the extent Carcharadon's breach of contract claim is premised on Plaintiffs' termination of the Agreements or failure to timely provide necessary information, that claim is arbitrable.  To the extent Carcharadon's claim is premised on other purported misconduct, it is not.

### B.      Count II: Breach of Contract (Against Plaintiffs by Sweig)

Sweig asserts that he is an intended third-party beneficiary of the Agreements and therefore entitled to enforce the arbitration provision.  He premises his breach of contract claim on the same alleged breaches discussed above.  [ECF No. 20-4 ¶¶ 298–309].

> For a third party to recover on a contract claim, the plaintiff must show that he or she was an intended, rather an incidental, beneficiary.  A plaintiff is considered an

intended beneficiary when the language and circumstances of the contract indicate
clear and definite intent that the plaintiff would benefit from the promised
performance.  The fact that a plaintiff would likely benefit from a contract does
not itself render the plaintiff an intended beneficiary.  A court must instead look
to whether the contract provides for the benefits of performance to flow directly
to the third-party.

Quinn v. Hewlett-Packard Fin. Servs. Co., No. 18-cv-10705, 2018 WL 6107071, at *6 (D. Mass.

Nov. 21, 2018) (citations and internal quotation marks omitted).  Here, Sweig is not an intended

third-party beneficiary of the Agreements.  The fact that Askey and Cohanim, Aryze's principals,

are parties to the Agreements but Sweig is not (even though he is Carcharadon's sole member)

suggests that the parties did not intend for Sweig to directly benefit from the Agreements.

Further, the mere fact that Sweig, as Carcharadon's sole member, stood to gain from the

Agreements is insufficient to render him an intended third-party beneficiary.  Cf. InterGen, 344

F.3d at 147 ("There is an important distinction between a nonsignatory who may benefit from a

signatory's exercise of its contractual rights (because of, say, an equity stake) and a third-party

beneficiary.").  Finally, with respect to arbitration specifically, the fact that the arbitration

clauses use the phrase "between the parties," [ECF No. 20-5 at 18, 43], in defining the universe

of arbitrable claims is clear evidence that the Agreements did not confer arbitration rights or

duties on Sweig as he is not a party to the Agreements.  The contracting parties could have

included (and contracting parties often do include) language in arbitration clauses to evidence

any intent to bind non-parties, but here they did not.  See, e.g., Barbosa v. Midland Credit

Mgmt., Inc., 981 F.3d 82, 88–89, 93 (1st Cir. 2020) (discussing arbitration provision binding

contracting party as well as other affiliated entities and individuals).  The decision to forgo such

language must be considered purposeful.  See Hogan v. SPAR Grp., Inc., 914 F.3d 34, 40 (1st

Cir. 2019) (citing Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc., 795 F.2d 1111,

1118 (1st Cir. 1986)).  Thus, in sum, Sweig is not an intended third-party beneficiary of the Agreements.

Because Sweig is not a party to, or an intended third-party beneficiary of, the Agreements, his breach of contract claims against Plaintiffs are not disputes *between the parties* arising from the Agreements.  Accordingly, his contract claim, in its entirety, is not arbitrable.

### C.    Counts III, IV, and V: Fraud (Against Askey by Defendants), Promissory Fraud (Against Askey by Defendants), and Negligent Misrepresentation (Against Askey by Defendants)

Although labeled differently, Counts III, IV, and V are essentially identical.  Compare [ECF No. 20-4 ¶¶ 310–18 (Count III)], with [id. ¶¶ 319–25 (Count IV)], and [id. ¶¶ 326–33 (Count V)].  Defendants assert that, to induce Carcharadon to enter the Agreements and continue performing under them, Askey made a series of misrepresentations about, among other things, his clout in the business world, how Aryze would be structured, how Ascend's IP would be used, and Defendants' equity interest in Aryze.

In support of their motion, Defendants argue that because (1) Askey made misrepresentations about the draft IP license agreement, (2) the draft IP license agreement was essential to commercializing Aryze's business, and (3) tasks performed by Carcharadon under the Agreements related to commercialization, their fraud claims arise from the Agreements. [ECF No. 20 at 18].  Similarly, they maintain that because Carcharadon's equity interest in Aryze "derive[s] directly" from the December 2017 Agreement, their fraud claims "emanate from the Agreements."  [Id.].  These arguments fail.  As discussed in the Court's previous Order, "[t]he fact that the Agreements contain an arbitration provision does not mean that any claim brought by Defendants against Askey . . . related to their business relationship must be arbitrated."  Ascend, 2021 WL 413639, at *7.  More specifically, the fact that Defendants' claims touch on the commercialization of, and Carcharadon's equity interest in, Aryze does not

14

mean that those claims arise from the Agreements.  Although the Agreements relate to commercialization and provide for Carcharadon's acquisition of 5% Aryze's equity, they are not the *exclusive* embodiment of the parties' relationship with respect to those topics.  As to commercialization, the Agreements only govern the provision of specific services by Carcharadon to Aryze.  [ECF No. 20-5 at 15 (noting that under the December 2017 Agreement, Carcharadon would provide "analysis, advice and assistance with respect to a wide variety of strategic, financial and operational issues related to the commercialization of various robotics applications for the global construction and/or adjacent marketplaces"); id. at 40 (noting that under the June 2018 Agreement, Carcharadon would provide "consulting services, analysis, advice, and assistance with respect to ARZYE's [sic] efforts to raise up to $50 million capital, in one or more Series ('Committed Capital') in support of Aryze's commercialization")].  Because the Agreements do not reference Ascend's IP or how Aryze would be structured, a claim based on Askey's alleged misrepresentations regarding those aspects of Aryze's commercialization does not arise from the Agreements.  As to equity, the December 2017 Agreement provides that, in exchange for services rendered, Carcharadon would receive a 5% equity interest in Aryze. [Id. at 16–17 (granting equity interest in Phoenix); ECF No. 20-4 ¶ 45 (noting that Aryze would step into Phoenix's shoes)].  Accordingly, a claim premised on Askey's purported misrepresentations regarding Carcharadon's receipt of additional equity beyond that 5%, see [ECF No. 20-4 ¶ 311], which is not referenced in or contemplated by the Agreements, also does not arise from the Agreements.

In sum, although Defendants' fraud claims relate to topics governed by the Agreements, they do not arise from the Agreements and are therefore not arbitrable.

### D.      Count VI: Equitable Estoppel (Against Plaintiffs by Defendants)

Defendants assert that Plaintiffs made representations regarding Defendants' equity interest in Aryze and the use of Ascend's IP and that they subsequently took positions contrary to those representations.  [ECF No. 20-4 ¶¶ 334–40].

As discussed above, because the Agreements do not govern Ascend's IP or whether Carcharadon would receive equity beyond the 5% called for in the December 2017 Agreement, to the extent that Defendants' estoppel claim is premised on a change in position regarding those topics, it does not arise from the Agreements.  To the extent, however, that Defendants' estoppel claim can be read to allege that Plaintiffs reneged on their contractual obligation to provide Carcharadon with a 5% equity interest in Aryze, see [ECF No. 20-4 ¶ 335 (noting Askey's representation that Carcharadon or Sweig had a 5% equity interest in Aryze); id. ¶ 338 (noting Askey's position that neither Carcharadon nor Sweig had any equity interest in Aryze)], that claim does arise from the Agreements.  Put another way, insofar as Defendants' ASOC can be read to allege that Plaintiffs failed to provide Carcharadon with the compensation that it contracted for, such a claim would arise from the Agreements and therefore be arbitrable.

### E.      Count VII: Breach of Fiduciary Duty (Against Askey by Defendants)

Defendants maintain that Askey breached his fiduciary duties by changing Aryze's business model, terminating the Agreements, and failing to provide Carcharadon with the equity interest in Aryze that it was entitled to.  [ECF No. 20-4 ¶¶ 341–44].

For the reasons discussed above, insofar as Defendants' fiduciary duty claim is based on Askey's termination of the Agreements or his failure to provide the contracted-for compensation, it is arbitrable.  To the extent Defendants' fiduciary duty claim is based on Askey changing Aryze's business model and/or changing course regarding the IP license agreement, it is not.

**IV.      CONCLUSION**

In sum, the parties had a complex and multi-faceted business relationship that lasted more than two years.  They agreed to arbitrate a subset of their disputes: "disputes between the parties arising from" the Agreements.  [ECF No. 20-5 at 18, 43].  Applying this arbitration provision to the ASOC leads to the conclusion that some of the claims asserted in the ASOC are arbitrable and others are not.  Accordingly, for the reasons set forth above, Defendants' motion to compel arbitration, [ECF No. 21], is <u>GRANTED</u> in part and <u>DENIED</u> in part.  Specifically, Plaintiffs are bound to arbitrate Counts I, VI, and VII of the ASOC to the extent those claims are premised on Plaintiffs' (1) termination of the Agreements, (2) failure to timely provide necessary information to Carcharadon, and/or (3) failure to provide Carcharadon with the 5% equity interest in Aryze that it contracted for.  Plaintiffs are not bound to arbitrate Counts I, VI, and VII to the extent they are premised on any other alleged misconduct or Counts II–V.

**SO ORDERED.**

November 8, 2021                                                    /s/ Allison D. Burroughs
                                                                           ALLISON D. BURROUGHS
                                                                           U.S. DISTRICT JUDGE